UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

William McMillon,

                              Petitioner,        07-CV-4806 (CPS)

    - against -                                   MEMORANDUM
                                                  OPINION
Malcolm Culley, Superintendent,                   AND ORDER
Livingston Correctional Facility,

                              Respondent.

----------------------------------------X
SIFTON, Senior Judge.

        Petitioner William McMillon was found guilty by a jury on
May 9, 2002 of one count of second degree murder in New York
Supreme Court, Kings County. The conviction was later reduced to
second degree manslaughter by the Appellate Division of the
Supreme Court of the State of New York, Second department. *People
v. McMillon*, 31 A.D.3d 136, 816 N.Y.S.2d 167 (2d Dept. 2006).
Petitioner is currently serving a sentence of 4 to 12 years at
the Livingston Correction Facility in New York as a result of his
conviction. Petitioner brings this petition for habeas corpus
pursuant to 28 U.S.C. § 2254 seeking to overturn his conviction
on the ground that the New York courts unreasonably applied
established Federal law when they determined that (1) there was
sufficient evidence to establish beyond a reasonable doubt that
he committed a reckless homicide; and (2) petitioner's privilege
against self incrimination was not violated when officers
deliberately delayed giving him *Miranda* warnings. For the reasons

stated below, petitioner's application is denied.


## BACKGROUND

The following facts are drawn from the parties' submissions in connection with this motion, including the record of petitioner's state court proceedings. Disputes are noted.


*Factual Background*

On March 7, 2001, 18-year-old petitioner William McMillon was in the courtyard of a Brooklyn housing project with Charles Frazier, Tyrone Newberns, and others. Tr. at 172, 222-225. Petitioner took a knife from Frazier, who was playing with it, and put it in his pocket. Tr. at 174, 225. Frazier took back the knife and, in doing so, ripped petitioner's pants. Tr. at 226. Petitioner then pulled a chain from Frazier's neck and refused to return it unless Frazier paid to repair his pants. A heated verbal exchange followed, during which Frazier threatened to stab petitioner if he did not return the chain. Tr. at 174, 182, 198, 227. Petitioner went into the lobby of the housing project, and Frazier followed petitioner and punched him in the face. Tr. at 227.[1] Petitioner refused to return the chain, and someone went to

---

[1] Petitioner alleged in his written statement to police, which was read to the jury at trial, that Frazier had a gun in his hand and that petitioner took the gun from him and left it by the mailboxes in the lobby. Tr. at 55. At trial, Frazier denied having seen or possessed any weapon that day. Tr. at 233.

find Francois, the owner of the chain, who arrived at the scene.
Tr. at 189. Francois appeared angry about petitioner's failure to
return the chain and walked towards the location with his right
hand inside his pants. Tr. at 177-78, 182.[2] Francois demanded the
chain and petitioner repeated that he would not return it unless
someone paid to have his pants fixed. Tr. at 191. As Francois
walked towards petitioner while gesturing with open hands,
petitioner pulled out a gun and shot him one time in the chest
from about five feet away, holding the gun straight out at
shoulder height.[3] Tr. at 157, 191-93, 210. Francois dropped to
the ground and petitioner ran into the building. Tr. at 193. A
witness saw a person reach towards Francois' waist area after he
was shot, grab an object, and run away. Tr. at 181. Two other
witnesses testified that Francois did not have a weapon when he
was shot. Tr. at 192, 233. Detective Lawrence Perkins arrived
within minutes of hearing the shot and found Francois unconscious
with a bullet wound to the chest. Tr. at 30. The autopsy evidence
revealed that the bullet took a downward path after it entered
Francois' body. Tr. at 115.

---

[2]Petitioner alleged in his written statement that when he saw Frazier
returning with Francois and others he became scared and went to retrieve the
gun from the lobby. Tr. at 56. Petitioner stated that he was not sure that
Francois had a gun, but he had a feeling that he did based on Francois' manner
of walking and talking. *Id*.

[3]In his written statement, petitioner alleged that he did not have time
to raise the gun, nor did he have time to aim before firing. Tr. at 57. He
further stated that he was afraid of getting hurt or killed if he did not take
action. *Id*.

Three days later, on March 10, 2001, police arrested
petitioner when he arrived at his mother's wake.[4] Huntley
Hearing Transcript at 14 ("H."). When petitioner became upset
that he would not see his mother, the detective permitted him to
enter the funeral home for 20 minutes following the wake. H. at
15, 16, 60. Detective Boyle thereafter transported petitioner in
handcuffs to the precinct and placed him in a small, windowless
interrogation room, where he handcuffed petitioner to a chair. H.
at 65-66. Detectives Boyle and O'Brien interrogated petitioner
for an hour, from 1:30-2:30 p.m., without giving him *Miranda*
warnings. H. at 68. Petitioner initially denied shooting
Francois. H. at 18. The detectives confronted petitioner with the
evidence and sympathized with him, stating that they wanted to
hear his side of the story. H. at 67-69. The detectives raised
the possibility that petitioner acted in self-defense, and told
him that petitioner was not the only person with a gun. H. at 66-
69. They also talked about possible punishment. H. at 68-70. At
2:30 p.m., petitioner stated that he wanted to give an account of
what happened, and the detectives read him the *Miranda* rights. H.
at 72. Petitioner gave an oral statement in which he "confirmed"
what officers had told him about his role in the murder, after
which officers asked petitioner to write out the statement. H. at

---

[4]Detective Boyle, who led the investigation into the homicide, had
learned that petitioner had been "very close" to his mother, who died shortly
before the homicide. H. at 4, 14.

25, 72-73. After the statement was written out, detectives
secured petitioner's agreement to provide a videotaped statement
to a prosecutor "for his own protection." H. at 77. Detectives
then gave petitioner a break for the first time since the
questioning began. H. at 76.

At 5:45 p.m., petitioner began giving his videotaped
statement. H. at 47. At the beginning of the interview, the
prosecutor gave petitioner his *Miranda* warnings, which petitioner
agreed to waive, and noted the presence of detectives Boyle and
O'Brien. *See* Videotape. The prosecutor showed petitioner the
*Miranda* warnings he had signed earlier in the day and petitioner
confirmed that his signature was present on them. *Id*. Petitioner
also confirmed that the written statement was in his handwriting
and contained his signature. *Id*. Petitioner's videotaped
statement for the most part paralleled the written statement. *Id*.

At trial, the prosecutor devoted the bulk of his summation
to petitioner's statements. Tr. at 283-299, 302-303. He told the
jurors that they could "[f]orget about all the other witnesses,"
because petitioner admitting killing Francois. Tr. at 284. At the
completion of the case, the trial judge instructed the jury to
consider the following charges in the alternative: intentional
murder, depraved indifference murder, first-degree manslaughter,
second-degree manslaughter, and second and third-degree weapons
possession. Tr. at 332-348. During deliberations, the jurors

requested and received the videotape and written statements. Tr.
at 363. The jury acquitted petitioner of intentional murder but
convicted him of depraved indifference murder; it did not reach
the remaining counts. Tr. at 373.

*Procedural History*

Prior to petitioner's trial, the trial court conducted a
*Huntley* hearing to determine if petitioner's statements to
detectives had been voluntary.[5] Following the hearing, the trial
judge denied the motion to suppress both the written and
videotaped statements. Tr. at 40-41.

On May 9, 2002, petitioner was sentenced to an incarceration
term of 20 years to life. On February 5, 2005, petitioner
appealed his conviction to the New York Supreme Court, Appellate
Division, Second Department ("Appellate Division"). Petitioner
cited *Jackson v. Virginia*, 443 U.S. 307; 99 S. Ct. 2781; 61 L.
Ed. 2d 560 (1979), arguing that the evidence was insufficient to
prove beyond a reasonable doubt that he committed reckless
homicide, because the evidence was sufficient only to show
intentional homicide, not reckless homicide. Petitioner further

---

[5]A Huntley Hearing is a hearing held pursuant to *People v. Huntley*, 15
N.Y. 2d 72, 255 N.Y.S. 2d 838, 204 N.E. 2d 179 (1965), which applied the
Supreme Court's decision in *Jackson v. Denno*, 378 U.S. 368; 84 S. Ct. 1774; 12
L. Ed. 2d 908 (1964). *Huntley* permits a defendant to challenge the lawful and
voluntary nature of any statement made to police that the prosecution intends
to use at trial. The judge must find voluntariness beyond a reasonable doubt
before the confession can be submitted to the trial jury. 15 N.Y. 2d at 78.

argued that the admission of his statements violated his privilege against self incrimination because officers had deliberately delayed in providing him with his *Miranda* warnings, citing *Missouri v. Seibert*, 542 U.S. 600, 159 L. Ed. 2d 643, 124 S.Ct. 2601 (2004).

On May 30, 2006, the Appellate Division unanimously modified and, as modified, affirmed petitioner's judgment of conviction. *People v. McMillon*, 31 A.D.3d 136, 816 N.Y.S.2d 167 (2d Dept. 2006). The Appellate Division found that the evidence was insufficient to support a conviction of depraved indifference murder, modified the judgment to record a conviction of second degree manslaughter, and remanded the case for resentencing.[6] *Id.* at 142. The court rejected petitioner's argument that the conviction had to be vacated because his conduct was consistent only with intentional homicide. *Id*. The court stated that a conviction of depraved indifference murder may be found legally insufficient either because the evidence demonstrates a manifest intent to kill, thereby negating the core element of recklessness, or because it fails to establish the required level of depravity and indifference. *Id*. at 139. It concluded that the appropriate relief in the first situation would be dismissal, whereas the appropriate relief in the second situation would be a

---

[6] "A person is guilty of manslaughter in the second degree when ... [h]e recklessly causes the death of another person..."  NY CLS Penal § 125.15 (2008).

reduction of the charge to manslaughter in the second degree. *Id*.
at 139-141. Stating that a jury's acquittal of intentional murder
reflected a finding that there was reasonable doubt as to
petitioner's intent to kill, and noting that petitioner had fired
only once and had claimed he did not intend to kill the victim,
the court found that the killing had been reckless and that the
evidence was sufficient to establish second degree manslaughter.
*Id*. at 141-42. The Appellate Division also held that suppression
of petitioner's statements was properly denied because
petitioner's pre-warning statements were "not inculpatory," and
his videotaped confession had followed a pronounced break and a
renewed *Miranda* waiver. *Id*. at 138.

Petitioner timely sought leave to appeal the Appellate
Division's decision to the New York Court of Appeals, which
request was denied on August 28, 2006. *People v. McMillon*, 7
N.Y.3d 815, 822 N.Y.2d 490 (2006). Petitioner was resentenced to
a term of imprisonment of four to twelve years. Petitioner has
filed no other actions with respect to the judgment aside from
the direct appeal. Petition at 3.

## DISCUSSION

### I. Exhaustion and Statute of Limitations

The submissions indicate, and respondent does not contest,
that petitioner has exhausted all state remedies as required by

28 U.S.C. § 2254(b)(1), and has timely filed his petition within one year of the date his conviction became final. *See* 28 U.S.C. § 2244(d).[7]

## II. AEDPA Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>     (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>     (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Clearly established Federal law" refers to the decisions of the United States Supreme Court rendered prior to the time of the relevant state-court decision. *Williams v. Taylor*, 529 U.S. 362, 412; 120 S. Ct. 1495; 146 L. Ed. 2d 389 (2000); *Brown v. Greiner*, 409 F.3d 523, 533 (2d Cir. 2005). A state prisoner may not be granted habeas relief on the ground that a State court

---

[7]Petitioner's conviction became final on November 26, 2006, 90 days after the denial of leave to appeal to the New York Court of Appeals, when the time expired for filing a petition for certiorari to the Supreme Court. Petitioner filed his petition on November 19, 2007.

erroneously applied a Federal Court of Appeals decision. *See Hoi Man Yung v. Walker*, 341 F.3d 104, 110 (2d Cir. 2003).

"A state-court decision is 'contrary' to established federal law withing the meaning of § 2254(d)(1) if it is 'diametrically different' from, 'opposite in character or nature' to, or 'mutually opposed' to the relevant Supreme Court precedent. *Henry v. Poole*, 409 F.3d 48, 68 (2d Cir. 2005) (quoting *Williams*, 529 U.S. at 405). To be "contrary to" clearly established federal law, a state court's conclusion of law must be opposite to a conclusion reached by the Supreme Court or resolved differently on a materially indistinguishable set of facts. *Williams*, 529 U.S. at 413.

A state court's decision is an "unreasonable application" of a Supreme Court holding "if [a] state court 'correctly identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case,' or refuses to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern." *Hoi Man Yung v. Walker*, 468 F.3d 169, 176 (2d Cir. 2006) (quoting *Williams*, 529 U.S. at 413). The issue is not whether all reasonable jurists would agree that there was error, but rather that there was "some increment of incorrectness beyond" mere error. *Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005) (quoting *Williams*, 529 U.S. at 411). "[T]he range of

reasonable judgment can depend in part on the nature of the relevant rule." *Yarborough v. Alvarado*, 541 U.S. 652, 664; 124 S.Ct. 2140; 158 L. Ed. 2d 938 (2004). The more general the rule in question, the more leeway the state court has in making its determination. *Id.* at 2149.

State court factual findings are, in this context, presumed to be correct. 28 U.S.C. § 2254(e)(1). This presumption can only be rebutted by clear and convincing evidence. *Id.*

## III. Sufficiency of the Evidence

Petitioner claims that the Appellate Division unreasonably applied Supreme Court precedent pertaining to sufficiency of the evidence, as stated in *Jackson v. Virginia*, 443 U.S. 307; 99 S. Ct. 2781; 61 L. Ed. 2d 560 (1979), when it determined that there was sufficient evidence to uphold his conviction for second degree manslaughter.

In *Jackson*, the Supreme Court stated that "the Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Jackson*, 443 U.S. at 315, quoting *In re Winship*, 397 U.S. 358; 90 S. Ct. 1068; 25 L. Ed. 2d 368 (1970). Therefore, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254... the applicant is entitled to

habeas corpus relief if it is found that upon the record evidence
adduced at the trial no rational trier of fact could have found
proof of guilt beyond a reasonable doubt." *Id*. at 324. The
evidence presented at trial is reviewed in the light most
favorable to the government, and all inferences are drawn and all
issues of credibility are resolved in the prosecution's favor.
*See United States v. Canady*, 126 F.3d 352, 356 (2d Cir. 1997).

Petitioner was convicted of the murder of Francois pursuant
to New York Penal Law § 125.25, under which one is guilty if,
"[u]nder circumstances evincing a depraved indifference to human
life, he recklessly engages in conduct which creates a grave risk
of death to another person, and thereby causes the death of
another person." N.Y. C.L.S. Penal § 125.25(2). The jury
acquitted petitioner of intentional murder, for which one is
guilty when, "with the intent to cause the death of another
person," he does cause the death of that person. N.Y. Penal Law §
125.25(1). On appeal, the Appellate Division reduced petitioner's
conviction to manslaughter in the second degree under New York
Penal Law § 125.15, for which one is guilty when "[h]e recklessly
causes the death of another person." N.Y. C.L.S. Penal § 125.15.

In a series of cases decided after petitioner was convicted
but before he sought review from the Appellate Division, the New
York Court of Appeals determined that juries were often confused
about to the distinction between depraved indifference murder and

intentional murder, resulting in convictions for depraved indifference murder where the required element of recklessness was lacking. *See People v. Suarez*, 6 N.Y.3d 202, 207; 844 N.E.2d 721; 811 N.Y.S.2d 267 (2005) ("Whether because jurors conclude that anyone who would intentionally take a life is depraved, or because they mistakenly believe that depraved indifference murder is a lesser offense than intentional murder and are reluctant to convict of the 'most serious' charge, the availability of a depraved indifference murder count has led juries to convict of that charge even though the evidence did not support it."); *see also People v. Payne*, 3 N.Y.3d 266, 271; 786 N.Y.S.2d 116; 819 N.E.2d 634 (2004); *Policano v. Herbert*, 430 F.3d 82, 88 (2d Cir. 2005) (citing cases). In response to this perception, the Court of Appeals determined that in order to reverse a conviction for depraved indifference murder in a case in which the defendant is also tried for intentional murder, a defendant must show that he had a "manifest intent to kill." *Payne*, 3 N.Y.3d at 271.

In this case, the Appellate Division stated that, in order to reverse on the ground that the evidence showed a "manifest intent to kill," it would need to conclude that there "was no valid line of reasoning and permissible inference that could have led a rational person to conclude, as the jury unanimously did, that the killing was reckless rather than intentional." *McMillon I*, 31 A.D.3d at 141. This analysis conforms to the standard

established in *Jackson v. Virginia*, 443 U.S. at 324 (a petitioner is entitled to relief only if "no rational trier of fact" could have found guilt beyond a reasonable doubt). The Appeals Division stated that, "in view of the fact that the defendant fired only once from a distance of at least five feet, and claimed to the police that he did not intend to kill or even injure the deceased," it could not conclude that this was one of the rare cases in which the evidence established a "manifest intent to kill." 31 A.D.3d at 141. Having found that a reasonable jury could find that petitioner had killed recklessly, but determining that there was insufficient evidence to establish depraved indifference, the court amended petitioner's conviction to reckless manslaughter. *Id*. at 142.

Petitioner argues that the evidence was consistent solely with an intentional killing. Petitioner points to the following facts to support his claim: he procured a weapon prior to the confrontation; two witnesses testified that petitioner held the gun straight in front of him when he shot Francois; petitioner was standing only a few feet away from Francois; petitioner shot Francois through the heart; and the autopsy showed that the gun was pointed downward as the shot was fired, contrary to petitioner's statement to police that the gun went off before he took it out and before he had a chance to point it. Even accepting a conclusion that the jury rejected petitioner's

description of events, these facts are not inconsistent with reckless murder. Petitioner stated to police that he did not intend to harm or kill Francois and that he was reacting to an uncertain situation in which he did not want to be hurt. There is no evidence that petitioner planned to protect himself by shooting Francois as opposed to using the weapon to threaten him, and when he did shoot, he fired only one shot. The Appellate Division did not unreasonably apply *Jackson* when it determined that a jury could find that petitioner acted with recklessness rather than intent.[8]

## IV. Voluntariness of Petitioner's Statements

---

[8]Cases cited by petitioner are not to the contrary, as each includes facts indicating defendant's clear intent to cause death. In *People v. Hafeez*, 100 N.Y.2d 253; 762 N.Y.S.2d 572; 792 N.E.2d 1060 (2003), the defendant planned revenge, isolated the victim, and killed the victim with a deliberate knife wound to the chest that entered the heart. In *People v. Gonzalez*, 1 N.Y.3d 464; 775 N.Y.S.2d 224; 807 N.E.2d 273 (2004), the defendant shot the victim in the chest and head and, after he fell, leaned over him and fired eight more shots. In *People v. Payne*, 3 N.Y.3d 266; 786 N.Y.S.2d 116; 819 N.E.2d 634 (2004), the defendant went to the victim's home armed with an "elephant gun" and shot him at point-blank range in the middle of the chest. *Id.* at 269. In *People v. Rose*, 208 A.D.2d 414, 617 N.Y.S.2d 301 (1st Dept. 2004), the defendant and a companion instigated a fight with the victim without provocation. When the victim tried to calm defendant's companion, the defendant pointed the gun at the victim's head from a short distance away and shot the victim in the eye. 208 A.D.2d at 415. In *People v. Jackson*, 202 A.D.2d 518, 609 N.Y.S.2d 65 (2d Dept. 1994), the defendant argued with the victim, ran to a nearby building, retrieved a handgun, returned to the scene of the argument, and shot the victim twice, at close range, hitting the victim's vital organs. 202 A.D.2d at 519. In *People v. Barden*, 598 N.Y.S.2d 87, 194 A.D.2d 548,(2d Dept. 1993), the defendant told the driver of a car that he had his "piece" and took out a gun, after which he committed a drive by shooting. 598 N.Y.S.2d at 87. In *People v. Hodge*, 561 N.Y.S.2d 749, 167 A.D.2d 251 (1st Dept. 1990), the defendant argued with the victim and returned soon after with a gun, struck the victim with the gun and then shot twice at the victim, at close range; the second shot hit the victim behind the ear and killed him. *Id.* at 750.

Petitioner next claims that the Appellate Division's decision to uphold the admission of his written and videotaped statements at trial was an unreasonable application of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), in light of the Supreme Court's opinion in *Missouri v. Seibert*, 542 U.S. 600, 159 L. Ed. 2d 643, 124 S.Ct. 2601 (2004).[9]

Under *Miranda*, an accused must be adequately informed of his or her constitutional rights prior to custodial interrogation. *Id*. at 467. This prior warning "provides 'practical reinforcement' for the Fifth Amendment right." *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 2630 81 L.Ed.2d 550 (1984). Failure to warn creates a "presumption of compulsion," so that "unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*." *Or. v. Elstad*, 470 U.S. 298, 307; 105 S. Ct. 1285; 84 L. Ed. 2d 222 (1985). A defendant's decision to relinquish his *Miranda* rights must be voluntary, knowing and intelligent. *Miranda*, 384 U.S. at 444-45. Evidence that the accused was "threatened, tricked, or cajoled" into giving a waiver will show that the defendant did not voluntarily waive the privilege. *Miranda*, 384 U.S. at 476. The voluntariness of a confession is reviewed under the "totality of the circumstances." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988); *see also*

---

[9]The Appellate Division did not cite *Seibert*.

*Lynumn v. Illinois*, 372 U.S. 528, 534, 9 L. Ed. 2d 922, 83 S. Ct. 917 (1963) (a confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given). The factors to be considered include the characteristics of the accused, including his experience, background, age, education, and intelligence, and the conditions of interrogation, including police conduct, length of detention, whether the questioning was repeated or prolonged, physical abuse, handcuff restraints, the deprivation of food or sleep, and psychologically coercive tactics. *Id.* at 901-2; *Schneckloth v. Bustamonte*, 412 U.S. 218, 226; 93 S. Ct. 2041; 36 L. Ed. 2d 854 (1973); *United States v. Anderson*, 929 F.2d 96,99 (2d Cir. 1991).

In *Or v. Elstad*, the Supreme Court held an accused who answered questions before receiving *Miranda* warnings was "not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." 470 U.S. at 318. The Court found that there the goals of the Fifth Amendment would not be served by allowing an earlier unwarned statement to "taint... subsequent statements obtained pursuant to a voluntary and knowing waiver." *Id.* The relevant inquiry is whether "the second statement was also voluntarily made... The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." *Id.*

In *Missouri v. Seibert*, the Supreme Court considered the

effect of 'two-step' interrogations on the effectiveness of a
*Miranda* waiver. In that case, the accused was subject to
custodial interrogation and confessed to the crime without
receiving *Miranda* warnings. 542 U.S. at 604-5. The officer then
turned on the tape recorder, administered the *Miranda* warnings,
and received a signed waiver from the defendant. *Id.* at 605. The
officer resumed the questioning with several specific references
to the statements that the accused had made prior to the
warnings. *Id.* The Court found that the postwarning confession was
inadmissible due to the "two-step interrogation technique," which
was "used in a calculated way to undermine the *Miranda* warning."
542 U.S. at 622 (Kennedy, J., concurring in judgment). The Court
noted that the "manifest" purpose of the question-first, warn
later approach is "to get a confession the suspect would not make
if he understood his rights at the outset." *Id.* at 613. Hearing
warnings *after* he had already made a confession, an accused would
not think that he had a genuine right to remain silent. *Id.*

The *Seibert* Court distinguished *Elstad* on the grounds that
the first, unwarned statement obtained in *Elstad* was brief, was
not the product of custodial interrogation, was not the result of
coercion, and the causal connection between the first and second
responses to the police were attenuated. *Id.* at 614-15. In
*Seibert*, by contrast, the unwarned interrogation took place at
the station house, and "the questioning was systematic,

exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid." *Id*. at 616. After identifying the dangers of mid-stream *Miranda* warnings, the Court determined that such warnings could be effective to ensure voluntariness, and identified five factors that bear on the question of whether a *Miranda* waiver given after an initial round of questioning is, in fact, effective. *Id*. at 615. These factors are: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the first round as continuous with the first." *Id*.

In this case, there are three statements at issue. The first statement came at the end of the hour-long unwarned custodial interrogation, when petitioner said that he would tell detectives "what happened," after which detectives administered the first *Miranda* warnings. The second statement included petitioner's oral and written confession given after receiving *Miranda* warnings. The third statement constituted the videotaped confession given after petitioner received *Miranda* warnings. Petitioner alleges that officers deliberately delayed giving him his *Miranda* warnings until after conducting an hour of interrogation, at

which point the waiver was not effective, and that the warnings given at the beginning of the video recording were ineffective, given that detectives had secured petitioner's agreement to make such a statement at the end of the earlier interrogation session, and petitioner felt bound by his earlier statements to again make a statement.

It is evident that the detectives waited until petitioner was ready to talk about the crime before they gave him *Miranda* warnings. For the hour preceding the warnings, petitioner was unaware that he had a right to remain silent and to request an attorney, therefore leaving him subject to the psychological techniques employed by the officers to encourage him to make a statement. However, it is equally clear that key factors described by the *Seibert* Court are not present with respect to petitioner's oral and written statements made after he was warned. The *Seibert* Court asked whether *Miranda* warnings given after a suspect had confessed could "reasonably convey that he could choose to stop talking even if he had talked earlier," 542 U.S. at 612, and concluded that they could not. In reaching this conclusion, the Court assumed that "[t]he object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Seibert*, 542 U.S. at 611. In this case, petitioner made no inculpatory statements during his hour-long

interrogation prior to being warned.[10] There was no overlap

between statements before and after the warning, nor were there

pre-warning answers to which petitioner would have felt bound in

giving his confession.[11] Accordingly, it is not unreasonable to

find that the *Miranda* waiver was effective pursuant to *Seibert*.

Given the deferential standard of AEDPA, I cannot say that the

Appellate Division's finding that the statements were admissible

was a clearly unreasonable application of established Supreme

Court precedent.

The question remains whether petitioner was in such a

vulnerable state that the warnings were ineffective under the

totality of the circumstances. If the *Miranda* warnings preceding

the second statement were ineffective, thereby rendering the

written and oral statements inadmissible, then it is necessary to

apply the *Seibert* factors to determine whether the warning

preceding the videotaped statement was ineffective on the ground

---

[10]Petitioner argues that his statement that he would tell the detectives "what happened" was inculpatory, because it evinced a clear shift from the denials that he had been giving during the first hour of questioning. It was clear to the officers that petitioner had decided to tell them something about the crime, which petitioner argues is evidence that the statement was inculpatory. However, the statement itself contained no substance connecting petitioner to the crime, and therefore it did not bind him to make particular further statements. Unlike *Seibert*, petitioner "retained a choice about continuing to talk." *Seibert*, 542 U.S. at 617; *see also Nova v. Bartlett*, 211 F.3d 705, 708 (2d Cir. 2000) ("Agreeing to tell the truth, without more, is not an inculpatory or self-incriminating statement.")

[11] Petitioner states that the detailed *questions* that he was asked were sufficient to bind petitioner to the substance of his confession, given that the confession confirmed the story the detectives told him before the warning. There is no reason to assume that petitioner felt bound by another person's account of what happened on the day of the killing. Petitioner was free to contradict the story told by the detectives.

that petitioner was simply repeating the statements that he had given before, and to which he felt bound.[12]

Petitioner's waiver of his *Miranda* rights given before he made his oral and written statements was voluntary under the "totality of the circumstances." *Green*, 850 F.2d at 901. Petitioner was 18 years old. There was no evidence that he had below-average intelligence or education. Petitioner was questioned for only an hour before being warned. There is no evidence of physical abuse during that hour, nor does it appear that petitioner was deprived of food or sleep. Furthermore, there is no evidence that petitioner was "threatened, tricked, or cajoled" into giving a waiver. *Miranda*, 384 U.S. at 476. Detectives stated that there were witnesses against him, and that if he were convicted of intentional murder, he could go to prison for a long time. However, appraising petitioner of the facts is not akin to deceit. The fact that petitioner chose to speak in order to 'give his side of the story' does not indicate that his

---

[12]It is evident that petitioner's videotaped statement was closely linked to his earlier written and oral statements. The questions and answers in the interrogation and in the video interview were both complete and detailed. Second, the two statements overlapped almost entirely. Third, the statements were separated by between two and three hours in time, and took place in the same location. Fourth, the detectives who questioned the petitioner and elicited from him the oral and written confession were present during the videotaped confession. The fifth factor, whether the interrogator's questions treated the second round as continuous with the first, is strongly present in this case, as the interrogator merely had the petitioner acknowledge his earlier *Miranda* waiver and state that the handwriting on the written statement was his own. However, the detectives told petitioner that the videotaped statement was necessary in order to ensure that his earlier statements were not misinterpreted.

will was overborne; instead, it indicates that he made a rational choice, albeit one that an attorney would advise him not to make, to tell his story about how the shooting happened.

One important factor weighs against this conclusion: it is evident from the record that petitioner was in a heightened emotional state at the time of the interrogation, given that his mother had just died and he was arrested at her wake a few hours before the interrogation began. However, considering the totality of the circumstances, there is no indication that petitioner's feelings about his mother's death rendered him incapable of refusing to speak to the detectives after being informed of his rights. This is not one of those rare cases in which a statement is involuntary despite the fact that officers adhered to *Miranda*. *See Berkemer v. McCarty*, 468 U.S. 420, 433, n. 20; 82 L.Ed. 2d 317; 104 S.Ct. 3138 (1984).

The evidence indicates that petitioner gave a knowing and intelligent waiver of his *Miranda* rights before giving his oral and written statements. Because I find that petitioner's first *Miranda* waiver was voluntary, I need not consider whether the second *Miranda* waiver prior to the videotaped statement was ineffective pursuant to *Seibert*.[13]

---

[13]The Appellate Division determined that admission of the confessions was harmless error, due to the "pronounced break" in the interrogation and after a renewed waiver of *Miranda* rights, citing only New York law. *McMillon*, 31 A.D. at 138. As is made clear in both *Elstad* and *Seibert*, the analysis of whether a second, warned statement must be excluded based on the inadmissibility of an earlier statement does not depend on whether there is a

**CONCLUSION**

For the reasons set forth above, petitioner's application for a writ of habeas corpus is denied. The clerk is directed to transmit a copy of the within to the parties, and to mail a copy of the within to the petitioner.

SO ORDERED.

Dated:     Brooklyn, New York
           August 5, 2009

                    By: /s/ Charles P. Sifton (electronically signed)
                                United States District Judge

---

break in the proceedings. The question is whether the suspect feels that he or she has a choice whether to speak. Nevertheless, a "substantial break in time and circumstances between the prewarning statements and the *Miranda* warning *may* suffice in most circumstances." *Seibert*, 542 U.S. at 622 (emphasis added).